UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 3:15-cr-00141 |
| | ) | JUDGE CAMPBELL |
| EDDIE LAMAR JOHNSON | ) | |

MEMORANDUM OPINION

I.    Introduction

Pending before the Court is Defendant Eddie Lamar Johnson's Motion to Suppress Evidence

Obtained Pursuant to Unlawfully Issued Wiretap. Docket No. 32. For the reasons set forth herein,

the motion to suppress will be DENIED.

II.    Factual and Procedural Background

The Government alleges that this case involves the sale and distribution of cocaine that was

trafficked from Mexico to Middle Tennessee. In 2010, law enforcement officials arrested several

individuals and seized handguns and a large quantity of cocaine and cash in Rutherford County,

Tennessee. One of the individuals arrested cooperated with law enforcement and provided

information that revealed that one of his customers was an individual known as Usvaldo Mejia. In

December 2014, an arrest was made in another large-scale cocaine trafficking organization operating

in Nashville, Tennessee, which led law enforcement to find Mejia's name in a ledger listing

individuals who had purchased cocaine.

In March 2015, the Metro Nashville Police Department (MNPD) arrested an individual (CS-

1) for a driver's license violation, and that individual agreed to cooperate with MNPD's investigation

of Mejia with the hope of receiving favorable consideration at the time of prosecution.  Docket No.

32-1 at ¶ 15. On March 18, 2015, the MNPD investigators conducted a controlled purchase of one

ounce of cocaine for $1,300 from Mejia, utilizing CS-1. *Id.* at ¶¶ 15–16. During that buy, Mejia told

CS-1 that he preferred to sell cocaine in whole kilos rather than in small quantities and that he was

expecting 12 kilograms to arrive in Nashville within a few days. *Id.* at ¶¶ 16–17. When law

enforcement agents showed him the driver's license photograph assigned to Usvaldo Mejia, CS-1

identified the photograph as the individual from whom he had purchased cocaine in the controlled

buy. An NCIC query indicated that Mejia had been deported to Mexico in February 2011. *Id.* at ¶

19. On April 9, 2015, DEA Nashville conducted another controlled purchase of nine ounces of

cocaine from Mejia, utilizing CS-1.

On June 25, 2015, the Government sought and obtained an order from Judge Sharp

authorizing the interception of communications over one of Mejia's telephones, Target Telephone

One ("TT1"). The Government's wiretap application was accompanied by a 58-page affidavit that

was executed and sworn to by James R. West,  Special Agent with the United States Drug

Enforcement Administration ("DEA"). Docket No. 32-1. The Affidavit details the investigative

methods used and information uncovered up to that point of the investigation. The Government

represents that, utilizing traditional investigation tools, law enforcement agents had been unable to

identify the full scope of Mejia's drug-trafficking activity, including the individuals involved in the

conspiracy, the source of the drugs in Mexico, or the methods used to carry out the illegal activities.

Once the Government had established the wiretap of Mejia's phone, agents intercepted

communications from an individual later identified as Eddie Lamar Johnson, who was seeking to

purchase cocaine from Mejia. On July 23, 2015, agents learned that 30 kilograms of cocaine had

been delivered to Mejia. The Government terminated the wiretap and arrested Mejia, who then

cooperated with the investigation. On the same day—July 23, 2015—agents stopped Johnson's car

in Clarksville, Tennessee and arrested him for his alleged involvement in the Mejia conspiracy. During a search incident to the arrest, officers found drugs on Johnson. The Government then executed a state search warrant on Johnson's residence, where officers found cocaine, marijuana, firearms, ammunition, and other items.

On August 6, 2015, a grand jury returned an indictment charging Johnson with possession with intent to distribute cocaine, possession with intent to distribute cocaine base, in violation of Title 21, United States Code, Section 841, and possession of firearms in furtherance of drug trafficking. Johnson now seeks to suppress all evidence derived from the wiretap.

III.    <u>Analysis</u>

A.    <u>The Necessity Requirement</u>

In order to obtain authorization to use a wiretap, the Government must strictly comply with the requirements set forth in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510–2530. *See, e.g., United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011); *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). One of those requirements, set forth in Section 2518(1)(c), is that the wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The purpose of this "necessity requirement" is to "'assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime' and to prevent wiretapping from being 'routinely employed as the initial step in criminal investigation.'" *United States v. Sims*, 508 Fed. App'x 452, 456 (6th Cir. Dec. 12, 2012) (quoting *United States v. Landmesser*, 553 F.2d 17, 19–20 (5th Cir. 1977)). It is not necessary, however, for the Government to prove that "every other

conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163; *accord Poulsen*, 655 F.3d at 504. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163–64; *accord Sims*, 508 Fed. App'x at *456; *Poulson*, 655 F.3d at 504.

This Court must accord "great deference" to the determinations of the judge who issued the wiretap. *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (citing *Alfano*, 838 F.2d at 162). "Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Alfano,* 838 F.2d at 162.

The Defendant argues that the Government's wiretap application failed to establish the requisite necessity for the wiretap. He argues that CS-1 helped agents obtain GPS data for Mejia's phone and determine his location, including where he lived. Docket No. 32 at 8 (citing Docket No. 32-1 at ¶ 20–21). Agents also were able to obtain intelligence through CS-1 regarding the delivery of a load of cocaine to Mejia and identified a potential source of supply by coordinating with DEA agents in Lansing, Michigan. *Id.* (citing Docket No. 23-1 at ¶ 22–30). The Defendant believes that the use of CS-1 was fruitful and criticizes the Government for discontinuing using him in the investigation. *Id.* The Defendant also argues that toll analysis of TT1 proved fruitful in that an analysis of phone data from June 11, 2015 to June 22, 2015 revealed that TT1 had connections to phone numbers associated with other known drug suppliers. *Id.* (citing Docket No. 32-1 at ¶¶ 38–40). According to the Defendant, the use of CS-1 coupled with GPS on TT1, toll analysis, and

surveillance eliminated the need for a wiretap, but the Government quit using these strategies, seeking the easier but more invasive wiretap as a tool. *Id.* The Defendant's motion to suppress requests that all evidence obtained from the wiretap, including calls attributed to him and derivative evidence such as his arrest, the search incident to his arrest which revealed cocaine on his person, his statements, and the evidence obtained during the search of his home, be suppressed as "fruit of the poisonous tree." Docket No. 32 at 5 (quoting *United States v. Wac*, 498 F.2d 1227, 1231 (6th Cir. 1974)).

B.     "Boilerplate" Language

The Defendant argues that the Government's wiretap application is invalid on its face because the affiant's "boilerplate assertions" are unsupported by specific facts relevant to the particular circumstances of this case. Docket No. 32 at 8. However, the Sixth Circuit has held that the "'mere fact that the affidavit ... rested in part on statements that would be equally applicable to almost any ... case [of this kind] does not render the affidavit insufficient' so long as there is 'information about particular facts ... which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.'" *United States v. Wright*, No. 13-3803, 2015 WL 3388778, at *4 (6th Cir. May 27, 2015) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (alterations in original)). It is not necessary for the Government to prove that "every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988); *accord United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been

or will likely be inadequate." *Alfano*, 838 F.2d at 163-64; *accord United States v. Sims*, 508 Fed.

App'x 452, 456 (6th Cir. Dec. 12, 2012); *Poulson*, 655 F.3d at 504. Indeed, although a criminal

defendant "parses each technique and contends that more should have been done with the techniques

that were working, and attempts should have been made with those that were deemed non-viable,"

such "a hyper-technical and speculative analysis is inappropriate. Rather the affidavit is assessed in

a practical and common sense fashion." *United States v. Wright*, No. 13-3803, 2015 WL 3388778,

at *4 (6th Cir. May 27, 2015) (citation omitted).

     C.     <u>Analysis of the Affidavit's Showing of Necessity</u>

The Defendant argues that the section of the Affidavit's statement about the necessity for

intercepting wire communications in this investigation uses boilerplate language. Agent West

provided the following information to support the necessity for the wiretap:

> 48. Based on my training and experience, as well as the experience of other federal, state and local agents and investigators participating in this investigation with whom your Affiant is familiar, and based upon all of the facts set forth herein, it is my belief that the interception of wire communications is the only available technique that has a reasonable likelihood of accomplishing the objectives of this investigation, including determining the entire size of the operation, their method of acquisition and distribution of cocaine, the identity of the participants and other conspirators of the organization, the nature and scope of the illegal activity, the relationship between financiers, manufacturers, importers, suppliers, and distributors of the cocaine, and the collection and distribution of monies which stem from the illegal narcotics activities and/or finance the illegal drug activities.

> 49. Although law enforcement has gained evidence regarding portions of the activities of the organization thus far, law enforcement has not yet identified the full scope of the organization. To date, the use of confidential sources, consensual telephone calls, and controlled purchases of cocaine, combined with other conventional law enforcement investigative techniques have not allowed law enforcement to fully meet the investigative goals set forth above. Interception of wire communications over TARGET TELEPHONE 1 will provide law enforcement with the opportunity to gather evidence as to the full scope of the organization and the means through which narcotics and money flow.

50. For example, agents have repeatedly tried, but not yet secured the following information critical to the investigation: (a) the full extent of the organization's criminal activity; (b) the identities of all members of the organization; (c) the identities of the organization's current sources of supply in the United States; (d) the identity of the person(s) who facilitate the importation of cocaine and the transportation of the cocaine to the Middle District of Tennessee; (e) the identity of the person(s) who facilitate the transportation of narcotics proceeds from the Organization to its sources of supply; (f) the routes taken to transport cocaine; (g) the routes taken to transport narcotics proceeds and the methods used; (h) the locations and addresses for stash locations used; and (i) the identities of the organization's customers.

51. your Affiant believes that the authorized interception of wire communications over TARGET TELEPHONE 1 will assist agents in obtaining the above information. The interception of the telephone is essential because your Affiant believes that intercepts over TARGET TELEPHONE 1 will help agents build and expand upon useful evidence collected by the investigation to date. TARGET TELEPHONE 1 is being utilized by Usvaldo MEJIA. Your Affiant's investigation has shown that MEJIA is the pivotal figure in the distribution activities of the organization in the Nashville, Tennessee area, and that MEJIA uses TARGET TELEPHONE 1 to assist in his cocaine distribution.

52. Based on knowledge of the facts of this investigation, experience, and upon information contained in this Affidavit, your Affiant believes that the interception of wire communications over TARGET TELEPHONE 1 is the only available investigative technique which has a reasonable likelihood of revealing the full scope and nature of the offenses being investigated and the full scope and nature of the organization's criminal activities and its associates.

53. Connections have been made between the current MEJIA investigation and ongoing investigations in Clarksville, Tennessee and Lansing, Michigan. Those investigations have allowed agents to identify certain members of MEJIA's drug trafficking organization, specifically Martinez in the Clarksville case and Alvarado in the Lansing, MI case. Perhaps most significantly, those related investigations have shown MEJIA to be a part of a large, multi-state criminal organization that is responsible for committing drug crimes in multiple jurisdictions. What those investigations have not accomplished is the uncovering of the cocaine trafficking organization operating in Nashville with MEJIA as its head. The Clarksville and Lansing investigations have not and will not reveal stash locations for drugs and money in Nashville, the method by which MEJIA receives cocaine shipments and collects and packages drug proceeds, or the identity of those who obtain and send cocaine shipments to Nashville and receive the drug proceeds when delivered to

Texas. The Clarksville and Lansing investigations are limited in their scope. The interception of wire communications over TARGET TELEPHONE 1 will afford agents the opportunity to determine the overarching conspiracy of which MEJIA is a part, resulting in the arrest of MEJIA and his co-conspirators and the seizure of illegal drugs and ill-gotten assets.

Docket No. 32-1 at ¶¶ 48– 53.

### 1. Physical Surveillance

The Defendant argues that physical surveillance in this investigation had been fruitful, and that the Court should not accept the Government's claims that physical surveillance would be futile at face value. Docket No. 32 at 11 (citing *United States v. Gonzalez, Inc*., 412 F.3d 1102, 1114 (9th Cir. 2005) amended on denial of reh'g, 437 F.3d 854 (9th Cir. 2006)). The Government argues that the Affidavit sufficiently presents the reasons physical surveillance was inadequate in the investigation.

The Affidavit provides several case-specific explanations about the need for a wiretap in order to supplement the information gathered by physical surveillance. For example, although the surveillance at a first address identified as belonging to Mejia was useful in that it helped corroborate information provided by CS-1, the agents were unable through physical surveillance to determine what Mejia was doing when two vehicles left his residence shortly after three of his associates had been stopped by the police. Docket No. 32-1 at ¶ 58. The Affidavit also gives the example of CS-1's controlled buy on April 9, 2015. *Id.* at ¶ 59. Agents knew from their surveillance that Mejia drove on the interstate, then drove to his home, then drove to meet CS-1 for the drug transaction, leading agents to wonder whether the drive on the interstate was to pick up cocaine from somewhere before meeting CS-1. *Id.* A third example given in the Affidavit is that Mejia told CS-1 that he was

purchasing a new home, which was helpful, but did not help agents determine which residence Mejia was using to store drugs and drug money. *Id.* at ¶ 60.

The Court finds that the Affidavit satisfies Section 2518(1)(c)'s requirement that the wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). That the Government was able to obtain some helpful information conducting physical surveillance of Mejia demonstrates that the wiretap in this case was not "employed as the initial step in criminal investigation." *United States v. Wright*, No. 13-3803, 2015 WL 3388778, at *4 (6th Cir. May 27, 2015).

2. <u>Pen Registers</u>

The Defendant argues that the Affidavit is "generically dismissive" of the use of pen registers. Docket No. 32 at 11. He also argues that the Affidavit itself demonstrates that the use of pen registers had been fruitful in the investigation for the purposes of connecting Mejia to other drug distributors. Docket No. 32 at 12 (citing Docket No. 32-1 at ¶¶ 38–40) . The Government counters that the Affidavit sufficiently explains why pen registers were inadequate in this investigation.

The Affidavit explains that pen registers have limited usefulness in narcotics investigations because (1) participants in drug conspiracies often have telephones that are subscribed to using aliases and/or incorrect addresses, and (2) they cannot reveal the content of conversations between subjects. Docket No. 32-1 at ¶ 67. The Affidavit states that these limitations, applicable to many narcotics investigations, apply equally in this particular investigation, as Mejia's telephone itself is listed under an incorrect name and a non-existent address. *Id.*

Defendant's argument that the use of pen registers had been fruitful in this investigation does not counter the Government's assertions about the limitations on the use of this investigative tool and, in any event, demonstrates that the wiretap in this case was not "employed as the initial step in criminal investigation." *Wright*, 2015 WL 3388778, at *4. The Court concludes that the Affidavit sufficiently explains the ways law enforcement officers were able to gather some information from the use of pen registers as well as the limitations of pen registers both generally and in this investigation.

### 3. Use of Grand Jury and Administrative Subpoenas

Defendant argues that the section of the Affidavit relating to the use of grand juries and administrative subpoenas is also "generically dismissive."

As to the use of grand jury and administrative subpoenas, the Affidavit provides the following reasons that these investigative tools would not be helpful in this investigation: (1) if the participants in this conspiracy were called "to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify," and offering immunity "would be unwise" (Docket No. 32-1 at ¶ 68); (2) serving grand jury subpoenas on the principals of co-conspirators would "alert them to the existence of this investigation, causing them to become more cautious," to flee, to threaten the lives of the informants, or to otherwise compromise the investigation (*id.*); (3) serving grand jury subpoenas to businesses who sell cellular telephones or otherwise issue cellular telephone numbers would not likely be helpful given "the routine practice of providing false or misleading subscriber information when such telephones are acquired," which the affiant had already described as an issue related to Mejia's phone, and also could result in

individuals working at such businesses notifying the participants about law enforcement's interest (*id.* at ¶ 69).

The Court concludes that the Affidavit adequately explains the shortcomings associated with the use of grand jury and administrative subpoenas generally, and why those shortcomings apply to this investigation in particular. Law enforcement agents are not required to use a technique they believe is likely to fail, and "the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried...." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977). Law enforcement is only required to include a full and complete statement as to why other investigative procedures "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The Government has satisfied that requirement as to grand jury and administrative subpoenas.

### 4. Confidential Sources

Defendant argues that the section of the Affidavit relating to the use of confidential sources is also "generically dismissive." He argues that the confidential source had been helpful to this investigation and that "for some unknown reason law enforcement ceased using CS-1." Docket No. 32 at 13.

The Affidavit described the assistance CS-1 had provided to the investigation, including his engagement in recorded narcotics-related conversations with Mejia and purchasing cocaine from Mejia on a few occasions. Docket No. 32-1 at ¶ 70. The Affidavit also detailed the limitations to the information CS-1, a lower-level member of a drug organization, would be able to provide. In particular, the affiant believed a confidential source at a low level would be unlikely to learn the identities of Mejia's sources of supply, the location of drug proceeds, bank accounts, locations where

drugs were stored, assets purchased with drug proceeds and their location, the identity of the supplier, knowledge of how to contact the supplier, when and how Mejia obtains the shipments of cocaine from his supplier, or how the drugs are distributed once in Nashville. *Id.* at ¶¶ 70, 73. The Affidavit states that Mejia had already proven himself to be suspicious of new drug customers and of CS-1 by asking his and CS-1's mutual friend questions about CS-1 in an attempt to determine whether CS-1 was working with the police. *Id.* The Affidavit states that "Mejia's apparent suspicion of CS-1 further reduces the likelihood of CS-1 learning more intimate details of Mejia's drug distribution activities." *Id.* The Affidavit also describes the limited role and knowledge of another confidential source that had been used in the investigation, who had limited knowledge of the drug distribution activities of a participant in the conspiracy who was based in Clarksville, Tennessee, but had no knowledge of that individual's larger scale drug activities or of the relationship between that individual and Mejia ("or even the existence of Mejia at all"). *Id.* at ¶ 72. The Affidavit also describes the more general problem with confidential sources, which is that it is generally not possible to communicate with the source to learn what is about to happen while the source is in the presence of the other conspirators. *Id.* at ¶ 71. That is, confidential sources only have wires or monitoring devices during a controlled purchase directed by law enforcement, but they are not so equipped when not with law enforcement. The Affidavit provides a concrete example of how this limitation had impaired this investigation:

> Information from confidential sources is usually communicated to a law enforcement officer after the drug activity is concluded and the confidential source has been able to separate from the other drug traffickers. This problem was made evident during the MEJIA investigation on April 7, when MEJIA called CS-1 while CS-1 was not in the presence of his/her law enforcement handlers. MEJIA explained to CS-1 that he was worried because his associates were not answering his phones, and as a result, MEJIA explained that he had moved his cocaine to a different location. CS-1 called

his/her law enforcement handlers after talking to MEJIA, but MEJIA had previously departed his residence in a vehicle with which agents conducting surveillance were unfamiliar. This highlights the fact that confidential source information cannot always be provided in real time.

*Id.*

The Court concludes that the Affidavit is sufficient as it details the Government's use of confidential informants during the investigation, and explains why the use of such informants likely would not yield the information necessary to further the investigation. 18 U.S.C. § 2518(1)(c)

### 5. Undercover Agents

Defendant argues that the section of the Affidavit relating to the use of undercover agents is also "generically dismissive."

As to the use of undercover agents in this investigation, the Affidavit states the following:

74. The use of undercover officers in this case is unlikely to succeed and is too dangerous to employ. The undercover agent could only infiltrate so far and learn very little about the person running the operation. Many of the problems with the use of undercover officers are the same problems with the use of confidential sources, as detailed above. However, it is much more difficult to have an undercover officer infiltrate an organization to the level that would allow him or her to have access to information and intelligence that would meet or exceed that available to a confidential source who is involved in the criminal activity. MEJIA has proven himself to be careful when choosing to deal with new cocaine customers as evidenced by his questioning of CS-1's friend about CS-1's potential involvement with the police. An undercover officer would face even stiffer suspicion from MEJIA because the only way an undercover officer could meet MEJIA in a drug trafficking capacity would be to be introduced by CS-1. CS-1 has not known MEJIA long enough to introduce new associates to MEJIA, and MEJIA would justifiably question CS-1's motivation to introduce a potential new customer to MEJIA instead of CS-1 selling cocaine to the new customer after obtaining it from MEJIA him/herself, and in turn making a profit.

75. Your Affiant also believes that the use of undercover agents will provide little insight into the full scope of the organization and their co-conspirators. Your Affiant believes it is extremely unlikely that an undercover agent could successfully infiltrate this organization at a high enough level to identify all the participants in the

conspiracy. This demonstrates that an undercover agent or a confidential source likely would not be able to penetrate the MEJIA drug trafficking organization to the extent needed to achieve the goals of this investigation. Specifically, your Affiant believes this organization uses multiple phones, which your Affiant knows through training and experience is one way drug traffickers avoid law enforcement undercover agents, by not providing phone numbers that are used for communication with other members of the organization, to new customers.

Docket No. 32-1 at ¶¶ 74–75.

The Court concludes that the Affidavit demonstrates that the use of undercover agents "reasonably appear[s] to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

6.     Consensual Recordings

Defendant argues that the section of the Affidavit relating to the use of consensual recordings is also "generically dismissive."

As to the use of consensual recordings, the Affidavit states the following:

Because consensual recordings are merely recorded conversations of a cooperating witness or an undercover agent, they are subject to the limitations described above. Agents, with the assistance of CS-1, have recorded telephone calls with MEJIA, clearly showing that MEJIA utilizes TARGET TELEPHONE 1 to conduct drug activity, but these calls do not reference the more significant participants of this conspiracy, including the higher level source(s) of supply, or address the inner workings of this narcotic distribution cell. Moreover, the telephonic contact between CS-1 and MEJIA is too limited to show the involvement of other co-conspirators in the organization. Only real-time interceptions of the calls over TARGET TELEPHONE 1 will provide the information necessary to achieve the investigative goals.

Docket No. 32-1 at ¶ 76.

For the reasons already provided under the sections related to undercover agents and confidential informants, the Court concludes that the Affidavit demonstrates that the use of

undercover agents "reasonably appear[s] to be unlikely to succeed if tried or to be too dangerous."

18 U.S.C. § 2518(1)(c).

### 7.     Interviews of Witnesses or Subjects and Arrest Warrants

Defendant argues that the section of the Affidavit relating to the use of interviews of

witnesses or subjects and arrest warrants is also "generically dismissive."

As to the use of interviews of witnesses or subjects and arrest warrants, the Affidavit states

the following:

> Agents conducting interviews of independent witnesses, cooperating individuals, or their known associates as an alternative to the wire interception requested here is not practical. The most knowledgeable subjects are also participants in the crimes under investigation and would be unlikely to cooperate and provide information without tipping off their co-conspirators. Contact with active members of the organization could compromise the entire investigation absent some degree of confidentiality. Your Affiant believes that eventually, interviews of co-conspirators in this matter would be communicated to the principal members of the organization, including MEJIA, or their subordinates or others, who would take additional precautionary steps to avoid the collection of evidence by law enforcement.

Docket No. 32-1 at ¶ 77. The Affidavit demonstrates these general propositions with two case-

specific examples. First, a cooperating defendant who was arrested in 2010 provided some valuable

information, but was unable to provide further information "as to the current cocaine distribution

activities of Mejia, because [the cooperating individual] has been incarcerated since 2010." *Id.* at ¶

78. The Affidavit provides a second example. Law enforcement agents detained some of Mejia's co-

conspirators in Clarksville, Tennessee, but the individual that the officers attempted to interview was

unwilling to cooperate with investigators. *Id.* at ¶ 79. The Affidavit explains that "individuals with

substantial involvement with the organization, or any persons arrested, may have reason to fear

retaliation by the organization against themselves or their families if they were to cooperate with authorities." *Id.* at ¶ 80.

Because the Affidavit demonstrates that interviews of witnesses or subjects and issuance of arrest warrants would be futile at best and likely the damage the investigation at worst, the Government was not required to utilize these investigative methods. 18 U.S.C. § 2518(1)(c).

    8.  <u>Financial Investigations</u>

Defendant argues that the section of the Affidavit relating to the use of financial investigations is also "generically dismissive."

As to the use of financial investigations, the Affidavit states that "agents lack knowledge of the U.S. Currency and assets purchased with ill-gotten gains possessed by MEJIA," but believe that the wiretap will provide that information because "narcotics traffickers often provide bank account numbers over the telephone to other co-conspirators, so that deposits can be made to provide payment for narcotics received, and therefore avoid the danger of physically transporting U.S. Currency across great distances." Docket No. 32-1 at ¶ 81.

The Court concludes that the Affidavit demonstrates that the use of financial investigations is unlikely to succeed in this case, as the investigators had not, through use of traditional investigative techniques, uncovered enough information to utilize this investigative tool.

    9.  <u>Search Warrants</u>

Defendant argues that the section of the Affidavit relating to the use of search warrants is also "generically dismissive."

As to the use of search warrants, the Affidavit articulates some of the limitations of their use in narcotics investigations:

> Based on your Affiant's experience and that of other law enforcement agents, the use of search warrants is unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of all the participants, and/or their methods of operation. Execution of search warrants would also tip off targets of the investigation, causing them to curtail or conceal their activities and bringing the investigation to an unsuccessful and premature conclusion. Based on the aforementioned, your Affiant believes that it would be more productive to execute search warrants at the conclusion of this investigation, once all of the locations have been identified and the goals have been substantially achieved.

Docket No. 32-1 at ¶ 82. The Affidavit details the following case-specific limitations to the use of search warrants in this case:

> The only residence of a known conspirator that agents have identified is that of MEJIA himself, and he only recently moved to that location over the weekend of April 11–12, 2015. Previously, MEJIA resided at 215A Valeria Street, the location he was observed departing on April 9, just prior to selling 9 ounces of cocaine to CS-1. Two days prior, MEJIA told CS-1 that he had moved his cocaine to a new location, unknown to both CS-1 and agents, and then two days after the transaction MEJIA himself moved residences. Because agents do not know what MEJIA uses his residences for with respect to his drug trafficking activities, the execution of a search warrant at either identified location would be premature in this investigation and would serve little purpose other than to alert MEJIA that he is under investigation.

*Id.* at ¶ 84. The Affidavit states that the agents expect "that wiretaps will provide the information necessary to establish the probable cause needed to obtain search warrants on these and other locations," and will "also provide investigators with the most opportune time to execute the search warrants to maximize the evidence obtained from the searches." *Id.* at ¶ 83.

The Court finds that Affidavit adequately explains the reasons that search warrants are likely to be unhelpful and even counterproductive in narcotics investigations in general and in this one in particular. The Government is not "required to attempt an ill-advised investigative technique in order to establish necessity." *United States v. Cooper*, No. 3:14-00090, 2015 WL 236271, at *11 (M.D. Tenn. Jan. 16, 2015) (citing *United States v. Sims*, 508 F. App'x 452 (6th Cir. 2012)).

10.    <u>Pole Cameras</u>

With respect to the use of pole cameras, the Affidavit states that the only power pole in proximity to the house in which agents believe Mejia resides is in the front yard of the house, such that it "would be impossible to covertly install a camera on that power pole without detection." Docket No. 32-1 at ¶ 85. The Affidavit further states that, even if agents were able to covertly install a camera on the pole in the yard, the pole is so close to the house that it would likely not have a good angle on objects directly below it. *Id.* Furthermore, agents believe that the other poles around the house would not provide a view of Mejia's house. *Id.* In addition, the Affidavit states that "effective use of a pole camera requires an identified stash location," which agents did not yet have in this case. *Id.* at ¶ 86.

Defendant argues that the section of the Affidavit relating to the use of pole cameras is "generically dismissive," and also that the Affidavit makes no attempt to explain why agents did not attempt to put a pole camera outside of a second home associated with Mejia (on Valeria Street) that the Affidavit elsewhere states may have been used as a stash house.

However, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (citation omitted). The failure of the Government to account for the decision not to place a pole camera outside that location does not doom its wiretap application. It is clear from the Affidavit that the wiretap in this case was not being "routinely employed as the initial step in criminal investigation." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

11.    <u>Tracking Devices</u>

Defendant argues that the section of the Affidavit relating to the use of tracking devices is also "generically dismissive."

With respect to the use of tracking devices, the Affidavit states as follows:

> The use of tracking devices placed on vehicles utilized by narcotics distributors can also be an effective investigative tool. At the current point of the investigation, agents have been able to identify three vehicles believed to be utilized by Mejia. Agents know that MEJIA utilized one of his vehicles, the GMC Sierra pickup truck, to deliver cocaine to CS-1 on April 9, 2015. Unfortunately, two days prior on April 7, when MEJIA suspected that something had gone wrong with his drug associates because he could not reach them on the phone, surveillance indicated that MEJIA departed his residence in one of two vehicles that left at the same time, leaving the GMC Sierra at the residence. CS-1 provided information that MEJIA had moved or was planning to move his cocaine to a new location around that same time, but agents were unable to determine which vehicle MEJIA was in, if MEJIA was transporting drugs, or if he was in [sic] route to move his drugs between separate, unidentified residences. It is not feasible to install tracking devices on the three vehicles that are registered to MEJIA, because agents would not know which vehicle MEJIA would operate at a given time, nor does the manpower exist to conduct physical surveillance on three separate vehicles in order to determine if MEJIA is operating one or none of them. Your Affiant believes that through the use of electronic surveillance, agents will be able to identify stash houses and residences where MEJIA stores U.S. Currency and narcotics, as well as identify additional vehicles solely utilized by MEJIA to further his narcotics trafficking activities.

Docket No. 32-1 at ¶ 87.

The Court finds that the Affidavit sufficiently explains the reasons that use of tracking devices "reasonably appear[ed] to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c)

12.    <u>Trash Searches</u>

Defendant argues that the section of the Affidavit related to the use of trash searches is "generically dismissive," and that the agents only attempted to search the trash once at each of Mejia's residence, which was insufficient to justify the necessity for a wiretap. Docket No. 32 at 14.

As to the use of trash searches, the Affidavit explains that "drug traffickers will often not use traditional trash collection services because they know that law enforcement may attempt to obtain evidence of drug trafficking from discarded materials that may be present in their garbage such as drug packaging materials, ledgers, phone numbers, and receipts." Docket No. 32-1 at ¶ 88. The Affidavit then states that, in this case, law enforcement agents had tried to search the trash at each of Mejia's two known residences, once in each location, and had not found a trash bin placed outside for collection on either occasion. *Id.*

The Court concludes that the Affidavit contains a sufficient explanation of the reasons that trash searches have been and are unlikely to succeed in providing the information needed in this investigation. That Mejia had not even placed a trash bin outside on the designated day for trash collection, on two different occasions, at two different residences, corroborates the agents' knowledge from prior experience that drug traffickers are not likely to place revealing information in the trash placed outside. Apparently Mejia did not utilize the local government's trash collection service at all, or else was not actually generating trash at these residences. In any event, the Government need not prove that "every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988).

Although the Defendant argues that the DEA agent's affidavit was "generically dismissive" of this and most of the other traditional investigative techniques, the Affidavit in this matter provides sufficient "information about particular facts ... which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation," *United States v. Wright*, No. 13-3803, 2015 WL 3388778, at *4 (6th Cir. May 27, 2015), and informs the Court "of the reasons

for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Alfano*, 838 F.2d at 163-64.

The cases relied on by Defendant are distinguishable from this case. For example, the Defendant cites *United States v. Rice*, arguing that it stands for the proposition that "generalized and uncorroborated information" about why traditional investigative techniques "would not be useful." 478 F.3d 704, 711 (6th Cir. 2007). But the wiretap affidavit in *Rice* contained statements that were misleading (suggesting physical surveillance had been used when they had not been), failed to indicate either serious consideration of other investigative techniques or reason the law enforcement officer believed other measures would be inadequate as used in that case, and demonstrated that "the government was using the wiretap in a forbidden manner—as the first step in its investigation." *Id.* at 708–09. None of the flaws with the *Rice* wiretap affidavit are present with the Affidavit before the Court.

## IV.  Conclusion

Having considered the information provided in the Affidavit the Government asserts supports the necessity for the wiretaps and the Defendant's challenges thereto, the Court concludes that the Affidavit fully satisfies Section 2518(1)(c) and applicable case law discussed herein.

For the foregoing reasons, the Court will deny the Defendant's motion challenging the wiretap in this case. An appropriate order is filed herewith.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE